No. 25-1138

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF NEW YORK, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Rhode Island

# EMERGENCY MOTION FOR IMMEDIATE ADMINISTRATIVE STAY
# (BY 10:00 AM, FEBRUARY 11, 2025) AND STAY PENDING APPEAL

BRETT A. SHUMATE
  *Acting Assistant Attorney General*

ZACHARY A. CUNHA
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

## INTRODUCTION

This appeal arises from an extraordinary and unprecedented assertion of power by a single district court judge to superintend and control the Executive Branch's spending of federal funds, in clear violation of the Constitution's separation of powers. To put a halt to this intolerable judicial overreach, this Court should stay the orders under review pending disposition of this appeal, and should enter an immediate administrative stay of the orders until the motion for stay pending appeal is resolved.

In particular, we respectfully request an administrative stay by **Tuesday, February 11, 2025, at 10:00 a.m.** We further request that the Court issue a stay pending appeal by Friday, February 14, 2025.

Earlier today, the district court issued a sweeping order that bars both the President and much of the Federal Government from exercising their own lawful authorities to withhold funding without the prior approval of the district court. The court appeared to acknowledge that its order prohibited federal agencies from taking entirely lawful actions, such as delaying the issuance of funding that might be tainted by fraud or declining to issue funds that are entirely discretionary. But to engage in any of those lawful activities, or a host of others across the multitude of programs administered by the defendant agencies, the government must now go to the district court for preclearance.

To make matters worse, this broad incursion on the orderly operation of government and the President's Article II authority to control the Executive Branch was premised on a lawsuit that ostensibly challenges a single memorandum from the Office of Management and Budget (OMB), which OMB has already rescinded. That memorandum is not the basis of any of the funding decisions that the district court now seeks to superintend. Moreover, the court's remedy was by no means limited to that non-problem, instead extending far beyond the plaintiffs to this case, far beyond any agency action that is plausibly before the court, and further still beyond the permissible bounds of any order that could plausibly be characterized as a proper temporary restraining order as opposed to a preliminary injunction. An immediate administrative stay, followed by a full stay pending appeal, is necessary to preserve the Executive Branch's ability to carry out the day-to-day operations of the government and protect the separation of powers.

This case began as a challenge to an OMB memorandum that instructed federal agencies, consistent with their own authorities, to implement certain of the President's policy priorities by pausing funding that may have been inconsistent with Executive Orders that the President had issued. Although the President's authority to direct subordinate agencies to exercise their authorities consistent with his policy preferences is well-settled, the district court issued what it styled as a temporary restraining order enjoining continued reliance on the memorandum—which had

already been rescinded by the time of the court's action—and added a vaguely worded prohibition on reissuing the memorandum in another form.

But the district court did not stop there. Although the government issued a notice instructing federal agencies to comply with the court's order, plaintiffs identified certain instances in which they believed that entities were not receiving federal funds fast enough. The government explained that these delays were attributable to various factors other than the OMB memorandum at issue in this case, such as delays in processing and a separate memorandum that had until then not been placed at issue here, but the court issued the sweeping order described above, asserting that it was consistent with the "plain text" of its original order. The court also accused the government of "violat[ing] the plain text of the TRO," but the government did no such thing, instead seeking in good faith to comply with all obligations of the order and notifying the court where ambiguity existed.

Under the new order, the President and federal agencies cannot delay *any* funding in order to ensure that taxpayer funds are being spent properly and responsibly without first getting permission from the district court. Indeed, federal agencies cannot delay funding even when authorized to do so by their organic statutes and regulations, unless they obtain permission from the district court. And this prohibition applies not to a particular program identified by the plaintiffs or the district court, but across all programs administered by numerous defendant agencies. A single district court judge has attempted to wrest from the President the power to

"take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This state of affairs cannot be allowed to persist for one more day. A stay pending appeal is warranted.[1]

## STATEMENT

1. On January 27, 2025, OMB issued a memorandum "requir[ing] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." Dkt. No. 27-1, at 2. The memorandum further stated that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by [certain] executive orders." *Id.* at 3 (emphasis omitted). In multiple places, the memorandum emphasized that agencies should take such action only "to the extent permissible by law." *Id.*

As the text of the memorandum and subsequent OMB guidance made clear, the memorandum's pause applied only to funding implicated by the President's recent Executive Orders. *See* Dkt. No. 27-1, at 3 (limiting pause to "activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders"); Dkt. No. 49-1, at 1

---

[1] As required by Rule 8 of the Federal Rules of Appellate Procedure, the government filed a motion for a stay pending appeal in district court. *See* Dkt. No. 100. We will inform the Court promptly when the district court acts on that motion. Plaintiffs oppose a stay.

("Any program not implicated by the President's Executive Orders is not subject to the pause."); *id.* (stating that the pause "is expressly limited to programs, projects, and activities implicated by the President's Executive Orders").

Moreover, the guidance reiterated that agencies should pause their funding activities only when doing so would be consistent with underlying law. *See* Dkt. No. 49-1, at 1 ("In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders."); *id.* ("Any payment required by law to be paid will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.").

2.  Plaintiffs are twenty-two states and the District of Columbia who challenged the memorandum on various statutory and constitutional grounds. They brought this litigation not only against OMB, which issued the challenged memorandum, but also against eleven other agencies and senior officials at those agencies. Plaintiffs moved for a temporary restraining order against the memorandum. Before the district court held a hearing on the motion in this case, a district judge on the District Court for the District of Columbia considering a similar challenge entered a partial administrative stay of the memorandum on January 28, and OMB subsequently rescinded the memorandum on January 29. Dkt. No. 43-1, at 1.

Despite the rescission, the district court in this case proceeded to consider plaintiffs' motion. At a hearing on January 29, the court heard arguments from both parties about the propriety of entering interim relief. The court ordered plaintiffs to file a proposed order outlining their requested relief and invited the government to file a response in opposition to plaintiffs' motion. In its opposition, the government vigorously contested the basis for issuing any relief, *see* Dkt. No. 49, at 1-6, and also identified several problems with the scope of plaintiffs' proposed order, *see id.* at 6-11.

On January 31, the district court entered an order styled a temporary restraining order. *See* Dkt. No. 50. The court acknowledged that "some aspects of the pause" contemplated by OMB's memorandum "might be legal and appropriate constitutionally for the Executive to take." *Id.* at 4. The court nonetheless believed that it had to assume the "worst case scenario." *Id.* On that basis, the court determined that plaintiffs were likely to succeed on some of their claims and to suffer harm if the court "denie[d] their request to enjoin enforcement of the funding pause." *Id.* at 4-10.

The court directed that the twenty-six government defendants "shall not pause, freeze, impede, block, cancel, or terminate [their] compliance with awards and obligations to provide federal financial assistance to the States" and "shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." Dkt. No. 50, at 11. The court commanded that the government defendants "shall also be restrained and prohibited

from reissuing, adopting, implementing, or otherwise giving effect to the [memorandum] under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant)." *Id.* at 12. The government was also obligated to provide written notice to numerous federal employees, contractors, and grantees in less than a full business day. *Id.*

The district court's order did not specify an end date but remains "in effect until further Order" of the court. Dkt. No. 50, at 12. The court's subsequent scheduling orders provide that briefing and argument on plaintiffs' motion for a preliminary injunction will not conclude until more than 14 days after the court's initial order was issued. The court formally extended its order through any ruling on the preliminary-injunction request based on "the complexity of the issues involved, the number of parties, and the need to maintain the status quo." 2/6/25 Text Order.

On February 3, one business day after the court issued its order, the government filed a notice highlighting several ambiguities and seeking clarification if the court believed that the government "ha[d] misunderstood the intended scope of the Court's Order." Dkt. No. 51, at 2. Plaintiffs did not raise a specific objection to the government's understanding, nor did the court issue any clarification. In the meantime, the government engaged in significant efforts to ensure compliance across the range of affected federal agencies and actors. Four days later, on Friday, February 7, plaintiffs moved to enforce the court's order, contending that the government was out of compliance. Plaintiffs identified a few instances in which funding had not yet

been restored.  In a response filed on Sunday, February 9 (at the court's direction), the government explained that agencies were not continuing to apply the OMB memorandum, which had been both enjoined and rescinded.  Rather, the government explained that delays in funding were attributable to administrative delays associated with an unusually large number of grantees seeking an unusually large amount of funding at the same time; the need to confirm that funding should properly be awarded, based on considerations apart from the OMB memorandum; and other lawful considerations such as an OMB memorandum that has not been challenged in this litigation and was issued before the one at issue here.

The district court granted the motion to enforce earlier today.  According to the court, the "plain language" of its order "prohibits all categorical pauses or freezes in obligations or disbursements based on the OMB Directive or based on the President's 2025 Executive Orders."  Dkt. No. 96, at 3.  The court indicated that the government could "request targeted relief" in specific instances of demonstrated compliance.  *Id.* at 4.  The court ordered that, for the duration of its order, the government "must immediately restore frozen funding," "must immediately end any federal funding pause," "must immediately restore withheld funds" including certain funds discussed in guidance issued before the OMB memorandum, and "must resume the funding of institutes and other agencies . . . (for example the National Institute for Health) that are included in the scope."  *Id.* at 4-5.

**ARGUMENT**

1. The district court's order represents an extraordinary usurpation of the President's Executive Power. The district court's original order, although issued without any lawful basis, at least respected the Executive Branch's authority to decline to award federal funds based on considerations separate from the now-rescinded OMB memorandum (all that was ostensibly at issue in this litigation). The court stated, in particular, that the government was prohibited from stopping funding "except on the basis of the applicable authorizing statutes, regulations, and terms." Dkt. No. 50, at 11.

The court apparently did not mean it. When informed that the government had not immediately provided all the funding plaintiffs wanted, the district court declared that the government had violated the court's original order. The court did not even purport to identify any statute, regulation, or other legal requirement that the government had violated. Nor did it explain why it would be proper—or, in some cases, even lawful, *see* 31 U.S.C. §§ 1341, 1517—to expend taxpayer dollars without first ascertaining that the money was properly and lawfully payable as requested.

For good measure, the court explicitly stated that the government must cease to apply an OMB memorandum that had been issued before the one at issue in this litigation, citing "the plain text of the TRO." Dkt. No. 96, at 4. The court did not specify which "plain text" imposed this requirement, though it apparently referred to the vague statement in the original order that prohibited the government from

"reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title," Dkt. No. 50, at 12, which the court recharacterized as a requirement "not to pause any funds based on pronouncements pausing funding incorporated into the OMB Directive," Dkt. No. 96, at 4. More extraordinary still, the court stated that its TRO extended to any funding pauses that might be based on "the President's 2025 Executive Orders." *Id.* at 3.

The court's order intrudes deeply into the prerogatives of the Executive Branch and the discretion committed to the President under Article II. The order thus undermines rather than promotes the rule of law by apparently requiring the government to expend taxpayer dollars without regard to its normal processes for ensuring compliance with applicable laws and regulations. The district court explicitly indicated that its order extends to funding decisions that were made not just based on the now-rescinded OMB memorandum that is at issue in this litigation, but as noted, also based on any of "the President's 2025 Executive Orders" and an OMB memorandum preceding the one challenged in this case. Dkt. No. 96, at 3. The court directed the government defendants to "immediately restore frozen funding" and "immediately restore withheld funds" apparently without regard to whether the agencies have discretion in holding back funds to conduct an orderly review. *Id.* at 4-5. And the carve-out for the government to "request targeted relief" in "a specific instance" only underscores the sweeping coverage of the court's micromanagement of funding decision across the Executive Branch. *Id.* at 4. Indeed, it is not clear how

the United States can even comply with this portion of the order, as it is barred from pausing or delaying payments even when good cause exists for doing so.

At a minimum, this Court should clarify that the district court's order is unlawful to the extent that it (a) extends beyond the since-rescinded OMB guidance, (b) prevents agencies from exercising whatever authority they possess under their organic statutes and regulations to delay or freeze funding, and (c) prevents the President from exercising the discretion that is committed to him under Article II of the Constitution. Agencies, for example, are entitled to take actions to pause or freeze funding for the anodyne reasons identified in the government's Sunday filing, or to effectuate the President's express policies. Indeed, that proposition is well settled, and neither the district court nor plaintiffs have meaningfully disputed it. *See Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926), citation omitted)); *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution.").

2.  For the reasons stated above, at an absolute minimum, an immediate stay is necessary to permit government agencies to exercise their authorities to prevent waste, fraud, and abuse, and to carry out the President's policies to the extent consistent with their own statutory and regulatory obligations.  But the errors in the court's analysis run deeper, and its original order, though less sweeping than the one issued today, was plainly contrary to law and should likewise be stayed.

As an initial matter, the district court did not even attempt to direct its order to a final agency action that is still in effect.  Rather, the court granted relief on the premise that the rescinded OMB memorandum could hypothetically affect an agency's decision about a federal grant at some point in the future.  The proper recourse was not to impose judicial oversight over the entire suite of funding decisions made by a huge swath of the Executive Branch, but to await a concrete dispute brought by a plaintiff alleging injury from an agency's discrete funding decision.  By nonetheless entering an order addressing the government's actions as an abstract matter divorced from the context of the terms of a specific award or the statutory provisions of a specific spending program, the court contravened Article III and statutory limitations.  Such limitations exist to ensure that judges resolve justiciable controversies, not supervise "day-to-day agency management."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004).

Those threshold issues are all the more objectionable because the OMB memorandum was plainly lawful.  As discussed above, the President has authority to

direct subordinate agencies to implement his agenda, and that is all that the rescinded OMB memorandum sought to accomplish. The memorandum was crystal clear that agencies should implement pauses on grants affecting specific administrative priorities only "to the extent permissible under applicable law" to facilitate further review. Dkt. No. 27-1, at 3. The district court was simply wrong to characterize the OMB memorandum as "unilaterally suspend[ing] the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself." Dkt. No. 50, at 5. The court's sorely misguided impression that the memorandum effected a "broad[] and indefinite[] pause [on] all funds" was essential to its determination that plaintiffs have established a likelihood of success for injunctive relief. *Id.*

As a legal matter, moreover, temporary pauses in funding are commonplace and accepted by the Legislative Branch. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability Office has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp.

Gen. Sept. 15, 1981). The OMB memorandum fits comfortably within this Executive Branch practice of short-term delays to determine how best to implement programs in accordance with the President's discretion and policy objectives, and consistent with the underlying law governing each program.

3. The balance of equities and public interest overwhelmingly favor a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). As noted, the district court's order prohibits agencies from exercising their lawful authorities to ensure that taxpayer funds are being expended in an orderly and proper fashion, and intrudes on the President's Article II authority to direct subordinate agencies how to exercise their own authorities. Barring the government from ensuring that, where legally permitted, agency funding decisions are consistent with those policies is a direct affront to the will of the people and an intolerable intrusion on the prerogatives of the Executive Branch.

The order in this case presents especially stark separation-of-powers problems. As noted, parts of the original order purported to explicitly preserve agencies' ability to exercise their own lawful authority, but the order also included a vague instruction not to "implement[]" or "otherwise giv[e] effect to" OMB's memorandum "under any other name or title." Dkt. No. 50, at 12. In addition to lacking the requisite detail and precision about the specific "act or acts restrained," Fed. R. Civ. P. 65(d)(1)(C), that language turned out to be an opening for the district court to substitute its own policy

preferences for those of the President by essentially requiring the court's approval—rather than the President's—before agencies exercise their lawful authority and discretion. As the court itself seemed to acknowledge, its broad order almost certainly sweeps in conduct that is "legal and appropriate constitutionally for the Executive to take." Dkt. No. 50, at 4. The Constitution vests the "entire" executive power in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). But the district court has in effect seized a portion of that power for itself. Such an affront to the separation of powers cannot stand.

The order's breadth magnifies these concerns. The order does not apply to a discrete agency action, but rather purports to govern the manner in which a range of federal agencies make funding decisions across a spectrum of federal spending programs. The order is not limited to the agency that issued the memorandum precipitating this lawsuit, but rather extends to numerous federal agencies and actors, including the President himself. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (holding that courts lack jurisdiction "to enjoin the President in the performance of his official duties"). And the order far exceeds the claimed injury stemming from plaintiffs' specific grant awards. There can be no doubt that a universal injunction is "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The harms to the government and the public in the interim could not be unwound. Even apart from the government's sovereign interests, the district court's

15

order would threaten to require the government to release federal funds in situations where the Executive Branch is legally entitled to make decisions about the disbursement or allocation of those funds. Indeed, the court's February 10 order refers to "immediately restor[ing] frozen funding," "immediately end[ing] any federal funding pause," and "immediately restor[ing] withheld funds." Dkt. No. 96, at 4. If the government's position is later vindicated in the litigation, there would be no guarantee that the funds would be retrievable from the recipients after the fact. There is no sound basis to compel the government to continue to take action that it considers "a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." Dkt. No. 27-1, at 2.

Conversely, plaintiffs have not established that they will suffer irreparable harm if the court's order is stayed pending appeal. Plaintiffs have not made an individualized showing that they will be deprived of money that is imminently needed to prevent some irreversible consequence. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining that any alleged irreparable harm "must be both certain and great" and of such "*imminence* that there is a clear and present need for equitable relief"). Instead, plaintiffs rely on generic assertions that they participate in federal grant programs, *see* Dkt. No. 50, at 7-8, but they ignore that they will receive any funds that agencies are legally obligated to disburse. And to the extent that plaintiffs have a cognizable legal dispute over a particular agency's decision

with respect to a particular grant, a court can consider the arguments in a lawsuit challenging final agency action in the context of the specific grant program.

4. The affirmative directives in the district court's orders leave no doubt that the relief granted is injunctive in nature and thus the orders are immediately appealable under 28 U.S.C. § 1292(a)(1). Plaintiffs would be mistaken to suggest that the orders should evade appellate review simply because the court used the label of temporary restraining order.

This Court has explained that the existence of adversarial presentation, the order's duration, and the order's practical effects are precisely the sorts of hallmarks that render an order subject to immediate appeal. *See Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020); *San Francisco Real Estate Investors v. Real Estate Investment Trust of Am.*, 692 F.2d 814, 816 (1st Cir. 1982). Here, the district court held multiple hearings, the government strongly opposed both the original order and today's order, and as discussed above the order's practical effect was profound. Far from merely preventing the government from relying on the allegedly unlawful (and now rescinded) agency action that gave rise to this litigation, the court ordered the government to take immediate and proactive steps to process and distribute various forms of federal funding—likely totaling many billions of dollars.

This case thus exemplifies the concern that the Supreme Court expressed about the need for limits on unappealable temporary restraining orders. As the Court explained, "[a] district court, if it were able to shield its orders from appellate review

17

merely by designating them as temporary restraining orders, rather than as preliminary injunctions, would have virtually unlimited authority over the parties in an injunctive proceeding." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974). This caution reflects the longstanding limited role of temporary restraining orders. Since Congress first expressly authorized federal courts to issue temporary restraining orders in 1872, those orders have been understood to permit interim relief preserving the status quo only until the issuing court is able to hold a hearing. *See* 1 James L. High, A Treatise on the Law of Injunctions § 3, at 4 (4th ed. 1905) (explaining that a temporary restraining order "is ordinarily granted merely pending the hearing of a motion for a temporary injunction and its life ceases with the disposition of that motion"). The purpose is to allow only "a very brief period" in which the court can consider whether to issue a preliminary injunction. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842-43 (2d Cir. 1962); *see also Houghton v. Meyer*, 208 U.S. 149, 156 (1908). A court cannot oversee the Executive Branch's spending authority for several weeks and shield its order from appeal by labeling it a temporary restraining order.

Apart from the profound practical effects, where, as here, "an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified." *Sampson*, 415 U.S. at 87. The nonspecific duration of the court's order further confirms its appealability. Although the government sought an

expedited schedule that would have allowed resolution of the preliminary-injunction motion in advance of the 14-day limit, the district court scheduled briefing and set a hearing after the expiration of that period without indicating any date by which it would rule.

Even if this Court were to conclude that the order is unappealable, the Court should exercise its discretion to treat this motion as a petition for writ of mandamus. *In re Providence J. Co., Inc.*, 293 F.3d 1, 9 (1st Cir. 2002). The district court's extraordinary order readily satisfies the standard to grant mandamus. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004).

## CONCLUSION

For the foregoing reasons, the Court should grant an immediate administrative stay of the district court's order and issue a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Acting Assistant Attorney General*

ZACHARY A. CUNHA
*United States Attorney*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

DANIEL TENNY

*/s/ Brian J. Springer*
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

FEBRUARY 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 4,759 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

_/s/ Brian J. Springer_
BRIAN J. SPRINGER

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Brian J. Springer*
BRIAN J. SPRINGER